JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Michael A. Naimoli, Jr., Morgan French, Andrew Collins and Marissa Santarlasci

**DEFENDANTS**
Pro-Football, Inc. a/k/a Washington Commanders Football Team f/k/a Washington Football Team f/k/a Washington Redskins Football Team, Daniel Snyder, Contemporary Services Corporation (CSC) and Compan

**(b)** County of Residence of First Listed Plaintiff    Camden County, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Loudoun County, VA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert D. Sokolove, Esquire
Curtin & Heefner LLP
1040 Stony Hill Road, Suite 150, Yardley, PA 19067

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☒ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ EXCESS OF $ 75,000 per plaintiff

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*  NONE

JUDGE          DOCKET NUMBER

DATE    9-6-22      SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
CIVIL DIVISION

MICHAEL A. NAIMOLI, JR.     : Civil Docket No. _____
15 Honeysuckle Drive       :
Sicklerville, NJ  08081      :
   and           :
MORGAN FRENCH       :
1092 Williamstown Erial Road    :
Sicklerville, NJ  08081      :
   and           :
ANDREW COLLINS       :
215 South Hanneviggre      :
Brooklawn, NJ  08030      :
   and           :
MARISSA SANTARLASCI     :
3 Sagebrush Lane        :
Sicklerville, NJ  08081      :
     *Plaintiffs*      :
              :
   v.            :
              :
PRO-FOOTBALL, INC.       :
a/k/a WASHINGTON COMMANDERS  :
FOOTBALL TEAM, previously known as  :
WASHINGTON FOOTBALL TEAM,   :
Previously known as       :
WASHINGTON REDSKINS FOOTBALL TEAM :
21300 Coach Gibbs Drive     :
Ashburn, VA  20147       :
   and           :
              :
WFI STADIUM, INC., previously known as :
JKC STADIUM , INC.       :
1600 FedEx Way        :
Landover, MD  20785      :
              :
   and           :

CONTEMPORARY SERVICES      :
CORPORATION (CSC)       :
17101 Superior Street       :
Los Angeles, CA 91325      :
    and          :
COMPANY DOES (Maintenance Subcontractors :
At FedEx Field)         :
Addresses Presently Unknown    :
       *Defendants*     :

## COMPLAINT

## PARTIES

1.  At all times relevant herein, Plaintiff Michael Naimoli ("Naimoli") has been an adult resident and citizen of the State of New Jersey, with an address as stated in the caption.

2.  At all times relevant herein, Plaintiff Morgan French ("French") has been an adult resident and citizen of the State of New Jersey, with an address as stated in the caption.

3.  At all times relevant herein, Plaintiff Andrew Collins ("Collins") has been an adult resident and citizen of the State of New Jersey, with an address as stated in the caption.

4.  At all times relevant herein, Plaintiff Marissa Santarlasci ("Santarlasci") has been an adult resident and citizen of the State of New Jersey, with an address as stated in the caption.

5.  Defendant Pro-Football, Inc., also known today as the Washington Commanders, previously known as the Washington Football Team, previously known as the Washington Redskins Football Team (hereinafter referred to as "Washington Commanders"), is and has been, at all times relevant to this action, a professional football team playing under the authority of the National Football League ("NFL").

6.  The Washington Commanders is incorporated in the Commonwealth of Virginia with a principal place of business at the address for the Washington Commanders as stated in the caption.

2

7. Defendant WFI Stadium, Inc. ("WFI"), previously known as JKC Stadium, Inc., is incorporated in Delaware with a principal place of business at the address for WFI as stated in the caption.

8. Defendant Contemporary Services Corporation (hereinafter referred to as "CSC") is incorporated in California with a principal place of business at the address for CSC as stated in the caption.

9. Defendants Company Does, upon information and believe, are various business entities and individuals providing maintenance and design services to and on behalf of the Washington Commanders with respect to design and maintenance services provided at the Stadium Property, said companies, upon information and belief, do not have a principal place of business in the State of New Jersey. The Washington Commanders, WFI, CSC and the Company Does are referred to hereinafter collectively as the "Defendants" and individually as a "Defendant."

## JURISDICTION AND VENUE

10. Jurisdiction in this Honorable Court is proper pursuant to 28 U.S.C. §1332 as all Plaintiffs reside in the State of New Jersey, all Defendants reside in States other than New Jersey, the damages incurred by Plaintiffs exceed $75,000.00, and all relevant actions in this matter occurred in Landover, Maryland.

## FACTS

11. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 10 as if fully set forth at length.

12. WFI is the owner of the property located at 1600 FedEx Way, Landover, Prince George's County, Maryland (the "Property") and the football stadium ("Stadium") constructed on

3

the Property. The Property and the Stadium are referred to hereinafter collectively as the "Stadium Property."

13. At all times relevant to this action, the Washington Commanders leased from WFI the Stadium Property and hosted NFL games at that location for attendance by members of the general public who held tickets for the games.

14. At all relevant times to this action, CSC is a company providing stadium security and crowd management, provided crowd control and crowd management and security at the Stadium Property.

15. On or about January 2, 2022, Plaintiffs paid for tickets and traveled approximately two and one-half (2½) hours from their homes in New Jersey to the Stadium Property and attended an NFL game between the Washington Commanders and the Philadelphia Eagles.

16. At the conclusion of that football game, Plaintiffs walked from their seats in the Stadium toward the tunnel area of the Stadium through which Philadelphia Eagles players, including quarterback Jalen Hurts, were leaving the football field, to head toward the Philadelphia Eagles' locker room following a 20-16 victory by the Philadelphia Eagles.

17. As is typically the case, at both home and away games, the Plaintiffs and many other fans cheering their own team, attempt to greet team members as they began to pass through the tunnel and head toward their locker room.

18. In this particular case, Plaintiffs sought and gained permission from CSC's employees and/or agents before entering the area adjacent to the tunnel through which the Philadelphia Eagles players were departing the playing field.

4

19.     Specifically, CSC employees/agents guided the Plaintiffs to a railing adjacent to the tunnel where Jalen Hurts and other Philadelphia Eagles were departing the playing field to enter the visitor's locker room.

20.     This was an area known by all Defendants to be a regular gathering location for football fans following a football game, in which fans typically leaned up against the railing above the exit way for the players to obtain a handshake, a "high five" or even articles from the game, such as headbands, wristbands, and other game used materials from the players themselves.

21.     All of the Defendants knew, or should have known, of the likelihood that fans would reach over and lean up against the railing which separated the fans in the stands from the players down below.

22.     In addition, all Defendants knew, or should have known, that extreme pressure (from the weight of leaning fans) would be placed on the railings between where the fans, including the Plaintiffs, were located and the tunnel below which was anywhere from approximately five (5) feet to almost ten (10) feet or more above the tunnel where the players exited.

23.     Notwithstanding the knowledge of all Defendants that the weight and stress levels on this railing were likely to be extreme, none of the Defendants made any effort to install railings in that location which were constructed and anchored to remain in place to prevent failure of said railings when fans inevitably leaned against the railings to interact with the players below.

24.     The railings were "anchored" by merely placing a railing "leg" into a "hole" below, such that the railings could literally be lifted out from the rail holding below. The only thing securing one railing section to another were zip ties made of thin plastic. Moreover, the design, structural integrity, and maintenance of said railings upon which the Plaintiffs were leaning was undertaken in such a temporary and non-supportive way, that the mere leaning against these

5

railings by a number of fans was likely to cause, and in this case, did in fact cause the railings to become dislodged from the "hole" and fall out from the base.

25.	Defendants' deficient design, maintenance and upkeep of this railing system, caused Plaintiffs and others, upon leaning against the railings, to fall into the tunnel area below when the railings dislodged and fell out beneath them.

26.	The occurrence of this railing failure and ultimate fall by the Plaintiffs, many feet below, onto the concrete floor of the tunnel, was a foreseeable condition which was known, or should have been known, to all Defendants in this case.

27.	There were absolutely no safeguards provided by any Defendants herein to assure that such a railing failure and fall onto the concrete tunnel floor by Plaintiffs and others would be avoided.

28.	At no time did any Defendants advise the Plaintiffs and others to avoid leaning against the railing. To the contrary, upon seeking permission from CSC employees/agents, Plaintiffs were directed and guided down to the railing area alongside of the tunnel.

29.	At no time did any of the Defendants inform, warn, or provide any information whatsoever to Plaintiffs suggesting that leaning against the subject railing was a danger.

30.	There was no signage of any kind at or near the subject railing informing the general public, including the Plaintiffs, that leaning upon the subject railing was a risk or a safety hazard.

31.	When the Plaintiffs leaned against the railing, it easily gave way causing Plaintiffs to fall to the concrete flooring approximately five (5) to ten (10) feet below.

32.	The Plaintiffs landed, one upon the other, and fell on top of other individuals as well, all falling onto a concrete surface below.

6

33. Moreover, at least two of the Plaintiffs landed in such a way that they became entangled with the railing itself, which caused their bodies to twist and torque from the stress of the falling railing interconnected with their limbs.

34. As soon as the Plaintiffs fell and landed in and around the railing, each other, and the concrete flooring, CSC employees immediately began to forcefully lift the railing and the Plaintiffs off of the ground, with no regard whatsoever for the injuries Plaintiffs suffered.

35. Forcefully lifting some of the Plaintiffs and others without first determining what, if any, injuries they had suffered from the fall was dangerous and falls below a reasonable standard by which injured spectators should be attended to in that situation.

36. At no time did CSC staff or other Stadium personnel gather the Plaintiffs or inquire or determine the level of injuries each of them had suffered. No examination of Plaintiffs' injuries was undertaken on the scene, and no information, whatsoever, including their names, addresses, or contact information was ever requested by any of the Defendants. No report was made or taken by any Defendants while Plaintiffs were still on the scene of their fall.

37. To the contrary, the Plaintiffs were physically and forcefully directed and shuttled back up over the wall from where they had fallen and were literally told by CSC staff to "get the fuck out of the stadium."

38. From the time of the fall by the Plaintiffs through the time they were shuttled out of the stadium, it was the evident desire and actions of the Defendants to undertake the greatest effort possible to quickly move the Plaintiffs out of the stadium without any regard for their health, safety, or welfare.

39. Subsequent statements by the Washington Commanders suggested, among other things, that "none of the individuals appeared to be injured" and that "stadium representatives

7

undertook appropriate actions" under the circumstances. Any suggestions to this effect are patently false.

40. Video taken of the events on this day clearly indicates that quarterback Jalen Hurts of the Philadelphia Eagles came perilously close to having the Plaintiffs, other spectators and the railings land on him which could have caused serious injury to him as well as the Plaintiffs and others themselves.

41. Moreover, these same videos appear to indicate that the only individual providing care, help and assistance to the Plaintiffs and others who fell, seemed to be Quarterback Jalen Hurts and none of the other Defendants in this case.

42. The NFL stated following the Plaintiffs' fall at the Stadium, that the NFL was going to do a full investigation as to the facts surrounding the failure of the railing and subsequent fall by the Plaintiffs. To date, Plaintiffs are unaware of any such investigation undertaken either by the NFL, or any of the Defendants herein.

43. As a direct and proximate result of the aforesaid actions and inactions by Defendants, and the conditions at the Stadium, the Plaintiffs suffered various serious injuries including, but not limited to, cervical strains, muscle strains, bone contusions, cuts, bruises, headaches and other potential long-term effects, both physical and emotional, from their falls.

44. Plaintiffs continue to receive medical attention, from this event, now more than seven (7) months after the occurrence.

45. Plaintiffs have been emotionally impacted by the event described herein, such that each of them relives in their minds, the fall which occurred, the bodies landing one on top of the other on the concrete below, and observing the pain that they, their friends, and other fans,

including at least one child, suffered as a result of the railing failure, causing the fall of all Plaintiffs.

46.     Defendants, collectively, have responded to the injuries to Plaintiffs described herein in a callous and indifferent manner at every step along the way, including, but not limited to, the failure to properly design, construct and maintain the railings at the Stadium in the first place; welcoming and directing Plaintiffs to an area within the Stadium which was known, or should have been known, to be unsafe; seeking no medical information from or attention for the Plaintiffs following their fall; physically and forcefully pushing the Plaintiffs back up over the wall from which they fell following their fall and the injuries suffered therefrom; thereafter, instructing the Plaintiffs to "get the fuck out of the stadium" and to ensure that in no respect whatsoever, the Plaintiffs would have the time to peacefully, carefully and critically understand and examine their own injuries before being forced to get back into their car and drive two and one-half (2 ½) hours back to their homes in New Jersey.

47.     Indeed, at no time since the event, more than seven months ago, have any of the Defendants ever attempted to reach out to any of the Plaintiffs to determine the level of their injuries, both physical and mental, despite the multitude of media outlets communicating that the Plaintiffs were injured and their explanation as to the lack of care and concern provided to them by all of the Defendants.

48.     The Defendants' callous and uncaring attitude and total lack of care and concern for the Plaintiffs is indicative of a total, outrageous, grossly negligent approach to how to properly attend to the business invitees which the Plaintiffs were, and whom all Defendants owed a reasonable duty of care.

## CAUSES OF ACTION

9

# COUNT I
## NEGLIGENCE / GROSS NEGLIGENCE
### (As To Defendants Washington Commanders and WFI)

49.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 48 as if fully set forth at length.

50.     The Washington Commanders and WFI, were in control of the Stadium Property on the days leading up to and including January 2, 2022.

51.     The Washington Commanders and WFI owed to the Plaintiffs, as business invitees, a duty of ordinary care to maintain a safe Stadium, including for occurrences that Defendants can reasonably anticipate.

52.     Upon information and belief, WFI and the Washington Commanders were required by NFL Rules and Regulations to maintain minimum standards regarding the football fan experience at each stadium where NFL games are played, including, but not limited to, minimum safety requirements and emergency procedures in the event of an accident, incident or event at each of the NFL stadiums.

53.     WFI and the Washington Commanders were aware that on each NFL game day in which a game was being played at the Stadium, in excess of 60,000, sometimes over 80,000 individuals would enter the Stadium Property and participate in all events within the Stadium for a period of perhaps six (6) hours, including the time of the game.

54.     WFI and the Washington Commanders knew, or should have reasonably anticipated, that at the end of each NFL game at the Stadium, spectators would gather in and around the tunnels at the Stadium leading to the locker rooms and lean on the railings adjacent to the tunnels.

10

55.     WFI and the Washington Commanders had a duty of ordinary care to assure that the quality, integrity, security, and maintenance of the railings in the Stadium were substantial and sufficient to perform the very function they were intended to; that is, provide a safe, secure buffer between the location of the spectators in the Stadium stands and the concrete floor of tunnel below.

56.     Notwithstanding this duty and the knowledge of WFI and the Washington Commanders, those Defendants did not undertake ordinary care through efforts to secure, enhance, maintain, or harden in any respect the railings in the Stadium adjacent to those tunnels where Plaintiffs fell.

57.     As a direct and proximate result of the aforementioned failures by Defendants Washington Commanders and WFI, the railings were inadequate, insufficient, deteriorated, unmaintained, uninspected, and in all material respects, deficient to the extent that their failure during the game of January 2, 2022 could have, and should have been anticipated.

58.     In light of these failures, the inadequacy of the railings, and the unreasonable design, maintenance, and adequacy of the railings, WFI and the Washington Commanders grossly neglected the duty of care owed to the Plaintiffs in a highly dangerous situation which ultimately was the cause of Plaintiffs falling and suffering injuries as aforesaid herein.

59.     The design, maintenance and/or inspection failures could have easily been addressed prior to the time the Plaintiffs were subjected to these failures, and the injuries suffered could easily have been avoided by some simple, easily maintainable and adequate safeguards, none of which WFI and/or Washington Commanders chose to undertake.  Upon information and belief, the motivation not to easily and properly address these obvious deficiencies was to reduce costs, despite the fact that Washington Commanders is now valued in excess of $4 Billion.

2709359.2/71054

60.    The resulting failures and injuries that followed therefrom that produced significant physical and mental impacts to all four (4) Plaintiffs, for which the Plaintiffs seek appropriate damages therefrom.

WHEREFORE, Plaintiffs demand, individually, damages in excess of $75,000.00 for each Plaintiff, including damages for their physical and emotional injuries, their medical expenses, loss of wages, disruption and inconvenience, attorney's fees, and seek punitive damages from all Defendants for all actions described within this Complaint, in an amount which this Court determines to be just and proper.

**COUNT II**
**NEGLIGENCE / GROSS NEGLIGENCE**
**(As To Defendant CSC)**

61.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 60 as though fully set forth at length.

62.    CSC is a highly visible security and crowd control organization which is responsible for maintaining control, providing safety, assisting in emergencies, addressing accidents, and generally insuring the well-being of spectators and other invitees into stadiums and similar venues, literally around the world, including NFL football games.

63.    CSC advertises and represents to the general public that it is the world leader in providing crowd control and safety for venues such as the Stadium Property and other similar event locations and that CSC is a company of thousands of well-trained employees.

64.    Upon information and belief, at each NFL game, at which CSC provides services, CSC is provided by the NFL and by the owners of the stadium where a game is played, including the owner of the Stadium Property the minimum standards CSC must undertake in providing its

services to the spectators and the invitees at large who enter the sporting venues, including at the Stadium Property on January 2, 2022.

65. On January 2, 2022, CSC had a duty of ordinary care to Plaintiffs and other spectators in the Stadium to protect them from dangers that CSC knew or should have know existed at the Stadium that day.

66. CSC knew and understood, or should have known and understood, and had become very familiar with, those locations within Stadium on any given day, including January 2, 2022, where dangerous situations could occur and where spectators and players could be at greater risk.

67. Among the various locations within the stadium where CSC knew or should have known of a heightened or potential danger and risk to safety, are the areas surrounding tunnels leading into the team locker rooms and particularly the increased risk at the end of each football game.

68. CSC, along with millions of spectators around the country, routinely observe both at professional football games, college football games, and at other sporting events, how spectators gather as close as possible to the tunnels when players are leaving the playing field, particularly at the end of each game.

69. Knowing of this increased risk and safety hazard, particularly at this critical time during each sporting event, CSC should have been on a heightened state of alert and undertaken more extraordinary measures to protect both the spectators and the players, most particularly, when spectators are leaning over the tunnel below to reach out to players who are leaving the field through the tunnel.

70. Notwithstanding this obvious risk of danger at this critical location and this critical time, CSC breached its duty of care to Plaintiffs and other spectators at the Stadium on January 2,

2022 by failing to undertake the required precautions to assure the safety of spectators, and by taking action directly regarding the Plaintiffs that increased the risk of injury and actually caused injury to Plaintiffs.

71.     Not only did CSC personnel fail to inspect the railings and/or distance the Plaintiffs from the aforesaid railings which surrounded the exit tunnel, but also CSC personnel invited and assisted the Plaintiffs to come down a ramp so as to be able to get closer to the players who were exiting the field through the tunnel, including, among others, Eagles quarterback, Jalen Hurts.

72.     As a result of the failures by CSC to inspect the railings, maintain distance between the Plaintiffs and the railings, and in all other material respects, provide a safety buffer between the Plaintiffs and the tunnel below, Plaintiffs were put into a position upon which the railings were allowed to give way and they fell into the tunnel below and onto the concrete flooring.

73.     Following this fall as previously described herein, CSC employees and agents failed to provide even the bare minimum of assistance to the Plaintiffs themselves. To wit, they offered no medical assistance, physically dragged the Plaintiffs out of the tunnel, and quickly hoisted them up to the area in the stands from which they had fallen. Further, they quickly gathered the fallen railings in an attempt to get them "back in place" as quickly as possible. In so doing, as they were grabbing the railings, they literally caught at least two (2) of the Plaintiffs limbs in the railings, thus twisting those limbs and creating further injuries.

74.     At no time whatsoever did CSC employees attempt to secure the area in and around where the Plaintiffs had fallen; they did not seek any information regarding the Plaintiffs' identities or their injuries or medical conditions; in fact, they created more pain and suffering when they physically pushed the Plaintiffs back up over the wall upon which they had fallen in the first place.

2709359.2/71054

75.     After successfully dragging the Plaintiffs back upon the wall from where they had fallen, CSC employees and agents, as quickly as possible, shuttled the Plaintiffs out of the Stadium. There was no effort whatsoever to assure that their medical conditions were satisfactory upon which they could leave the Stadium, let alone get in their cars and drive over two and one-half (2½) hours back to their homes.

76.     As previously indicated, the CSC distain for the safety, health, and well-being of the Plaintiffs following their fall, is further exemplified by their employee/agent statements to the Plaintiffs that they should "get the fuck out of the stadium."

77.     These statement combined with the CSC efforts to quickly and forcefully eject the Plaintiffs from the area in which they had fallen and out of the stadium indicates a callous disregard for the safety, health and welfare of the Plaintiffs.

78.     Further, by refusing to secure the area, gather the Plaintiffs into one area along with other spectators who had fallen, CSC made every concerted effort to separate what would otherwise be witnesses to this event in an obvious attempt to block further discussion and exchange of potentially important witness evidence between various parties, including the Plaintiffs, who had fallen.

79.     Such a blatant effort represents evidence on the part of CSC, and upon information and belief, the other Defendants of an interest in protecting any financial harm to the Defendants themselves instead of placing a higher priority on the welfare and interests of the Plaintiffs and other spectators.

80.     As a direct and proximate result of the aforementioned failures by CSC, the railings in the Stadium adjacent to the tunnels failed and fell resulting in injury to the Plaintiffs when they fell and landed on the concrete tunnel floor.

15

81. As a result, Plaintiffs suffered significant physical, emotional and other harm and injuries.

WHEREFORE, Plaintiffs demand judgment for their injuries, both physical and emotional, and seek compensation for their damages including, loss of income, medical expenses, pain and suffering, attorney's fees, and punitive damages against CSC in an amount in excess of $75,000.00 for each named Plaintiff.

**COUNT III**
**NEGLIGENCE / GROSS NEGLIGENCE**
**(As To Companies Does Maintenance Subcontractors at the Stadium Property)**

82. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 81 as if fully set forth at length.

83. Upon information and belief, WFI and the Washington Commanders hired, employed, maintained, and/or engaged various Company Does to provide inspection, repair, maintenance, design and oversight of all physical facilities at the Stadium Property during a period of time leading up to the events at issue in this case culminating with the Plaintiffs' fall on January 2, 2022.

84. Each of these presently unknown/unnamed Company Does owed a duty of ordinary care to Plaintiffs and other spectators at the Stadium Property on January 2, 2022 to have reasonably inspected and reviewed the conditions at the Stadium Property, and/or counselled WFI and the Washington Commanders as to certain unsafe and/or dangerous conditions at the Stadium Property.

85. Notwithstanding the duty of these Company Does, it appears that no reasonable efforts were undertaken by them to assure that the aforementioned railings along the tunnels where

2709359.2/71054

players exited the field were designed, maintained, and/or repaired in a manner such as to keep such railings operational in a safe and effective manner.

86. The failures of these unnamed Company Does to fulfill their duty of care to the Plaintiffs along with and in conjunction with aforementioned of WFI, the Washington Commanders and CSC contributed jointly and severally to cause damage, injuries, both physical and emotional, to the Plaintiffs herein.

87. The actions of these Defendants, jointly and severally, fell below a reasonable standard of care for which they should be liable to the injury and damages suffered by the Plaintiffs.

88. As a result, Plaintiffs suffered physical, emotional and other harm and injury therefrom.

WHEREFORE, Plaintiffs demand damages in excess of $75,000.00 for each Plaintiff, for their physical and emotional injuries, loss of income, medical expenses, attorney's fees, and seek punitive damages from all Defendants for all actions described within this Complaint, in an amount which this Court determines to be just and proper.

2709359.2/71054

CURTIN & HEEFNER LLP



By: _____
     Robert D. Sokolove, Esquire
     Attorney for Plaintiffs
     Attorney I.D. #316455
     1040 Stony Hill Road, Suite 150
     Yardley, PA  19067
     (215) 736-2521 (Office)
     (302) 381-8062 (Cell)
     Email: rs@curtinheefner.com

2709359.2/71054

# VERIFICATION

Plaintiff, Michael A. Maimoli, Jr., hereby verifies that he is the Plaintiff herein; that he is acquainted with the facts set forth in the foregoing Complaint; that the same are true and correct to the best of his knowledge, information and belief, and that this statement is made subject to penalties relating to unsworn falsifications to authorities.

Michael A. Naimoli, Jr.

## VERIFICATION

Plaintiff, Morgan French, hereby verifies that she is the Plaintiff herein; that she is acquainted with the facts set forth in the foregoing Complaint; that the same are true and correct to the best of her knowledge, information and belief, and that this statement is made subject to penalties relating to unsworn falsifications to authorities.

Morgan French

## VERIFICATION

Plaintiff, Andrew Collins, hereby verifies that he is the Plaintiff herein; that he is acquainted with the facts set forth in the foregoing Complaint; that the same are true and correct to the best of his knowledge, information and belief, and that this statement is made subject to penalties relating to unsworn falsifications to authorities.

Andrew Collins

## VERIFICATION

Santarlasci

Plaintiff, Marissa ~~Sanarlasci,~~ hereby verifies that she is the Plaintiff herein; that she is acquainted with the facts set forth in the foregoing Complaint; that the same are true and correct to the best of her knowledge, information and belief, and that this statement is made subject to penalties relating to unsworn falsifications to authorities.

Marissa Santarlasci