## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MICHAEL A. NAIMOLI, JR.,
MORGAN FRENCH,
ANDREW COLLINS and
MARISSA SANTARLASCI,

     Plaintiffs,

     v.

PRO-FOOTBALL, INC.
*a/k/a Washington Commanders Football*
*Team, previously known as Washington*
*Football Team, previously known as*
*Washington Redskins Football Team,*
WFI STADIUM, INC.,
*previously known as JKC Stadium, Inc.,*
CONTEMPORARY SERVICES CORP. and
COMPANY DOES,

     Defendants.

Civil Action No. TDC-22-2276

## MEMORANDUM OPINION

Plaintiffs Michael A. Naimoli, Jr., Morgan French, Andrew Collins, and Marissa Santarlasci have filed this civil action against Defendants Pro-Football, Inc., WFI Stadium, Inc., and Contemporary Services Corporation in which they allege negligence claims arising from injuries that they sustained at a January 2, 2022 professional football game at FedEx Field in Landover, Maryland. Defendants have filed a Motion to Compel Arbitration and Dismiss, ECF No. 35, and Plaintiffs have filed a Cross Motion for Partial Summary Judgment, ECF No. 38, both of which are fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be DENIED, and Plaintiffs' Motion will be GRANTED.

## BACKGROUND

### I.    Factual Background

On the morning of January 2, 2022, Plaintiffs drove from their homes in New Jersey to FedEx Field ("the stadium"), a stadium located at 1600 FedEx Way, Landover, Maryland, which is owned by Defendant WFI Stadium, Inc. ("WFI"). Plaintiffs entered the stadium to attend a National Football League ("NFL") game between the Philadelphia Eagles and the Washington Football Team, now known as the Washington Commanders, which is legally known as Pro-Football, Inc. ("PFI"). Plaintiffs accessed the stadium using tickets which had been purchased by non-party Brandon Gordon, who is Naimoli's cousin. At the conclusion of the game, hoping to greet the Eagles players, Plaintiffs moved from their seats to an area of the stadium located near a tunnel through which the players would pass as they left the field. Plaintiffs sought and obtained permission from staff members of Contemporary Services Corporation ("CSC"), the company that provided security at the game, before entering that area, which had a railing separating fans from the players who would pass beneath them.

Upon receiving permission from CSC staff members, Plaintiffs were guided to stand in the railing area alongside the tunnel. In an attempt to greet the players, Plaintiffs leaned against the railing, which gave way and caused Plaintiffs to fall five to ten feet onto the hard surface below. CSC staff began to lift Plaintiffs and the railing off of the ground, but they did not render medical aid or address any potential injuries. CSC staff directed Plaintiffs to get back on the wall from which they had just fallen and told them to "get the fuck out of the stadium." Am. Compl. ¶ 45, ECF No. 32. Plaintiffs then left the stadium and drove back to New Jersey.

Although the NFL later stated that it would complete a full investigation of the incident, neither the NFL nor any Defendants undertook an investigation. Plaintiffs have suffered a variety

of physical injuries and emotional impacts from the fall, and they continued to receive medical care for their injuries at least up to September 9, 2022, the date of the filing of the original Complaint in this case. In the presently operative Amended Complaint, Plaintiffs allege claims of negligence or gross negligence against Defendants arising from this incident.

## II.     The Arbitration Clause

Defendants seek dismissal of this action based on an arbitration clause that appeared on the "back" of the electronic tickets sold for entry to the game and also appeared in the "Washington Football Team Terms & Conditions ("WFT Terms & Conditions") found on the website used to purchase the tickets. The arbitration clause reads, in relevant part:

> Any dispute, claim, or cause of action in any way related to the ticket or the event shall be resolved by mandatory, confidential, final, and binding arbitration in Loudon County, Virginia. Holder and Management agree that all disputes shall be arbitrated on an individual basis. Holder understands that they are waiving their right to a court or jury trial and any right to litigate or arbitrate any claim as a class action, representative action, or class arbitration. If Holder does not consent to this clause, Holder must leave or not enter the stadium. This clause is governed by the Federal Arbitration Act.

Laurer Decl. Ex. 1 at 1, Defs.' Mot. Ex. B, ECF No. 35-3. Under the WFT Terms & Conditions, a "Holder" is "[t]he person seeking entry pursuant to such license, and any accompanying minors." *Id.* The Holder is "deemed to have read the Terms and has agreed to be bound by them." *Id.* "Management" is defined as the NFL, the Washington Football Team "and/or WFI Stadium, Inc.," individually or collectively. *Id.*

## III.     Ticket Purchase and Admission

Because Defendants argue that Plaintiffs are bound by the arbitration clause, the parties have submitted additional information relating to the circumstances under which Plaintiffs' tickets were purchased and used to enter the stadium.

3

In the Amended Complaint, Plaintiffs state that they "received the tickets for the game from Naimoli's cousin" who had purchased the tickets on TickPick, a third-party ticket outlet. Am. Compl. ¶ 16.  The Amended Complaint further states that Naimoli's cousin was not in attendance at the game but instead electronically forwarded to Plaintiffs the tickets, which "consisted of PDF files which listed the name, date, and location" of their seat numbers and included a QR code, with no terms and conditions appearing on those tickets.  *Id.* ¶ 20.  Plaintiffs asserted that they gained entrance to the stadium by "open[ing] the PDF files on their smartphones" while "ticket-takers scanned the QR code."  *Id.* ¶¶ 20-21.  Plaintiffs state that no terms and conditions were presented to them by the ticket-takers or displayed in their view at any time during the course of their entry into the stadium.

With the briefing on the Motions, the parties submitted declarations and exhibits which have clarified how the tickets were purchased and used on the day in question.  On December 27, 2021, six days before the football game, Naimoli's cousin, Brandon Gordon, purchased the tickets through TickPick.  At that time, when a ticket purchase was made through TickPick, the purchaser was sent a link to access the tickets through the Washington Football Team's specific ticketing webpage contained within the Ticketmaster website, which was specifically designed with Washington Football Team branding ("the WFT/Ticketmaster Website").  Users were required to log in using their Ticketmaster account information in order to access their tickets.  On January 2, 2022, Gordon signed in to his Ticketmaster account prior to the game and placed the tickets in the Apple Wallet application on his iPhone.

Both Gordon and Defendants have provided screen-capture images depicting the various steps necessary to download the tickets.  After he received a confirmation email from TickPick on December 27, 2021, Gordon received an email from the "Washington Football Team Ticket

4

Office" directing him to accept the nine tickets he had purchased.  Gordon Decl. Ex. 3, Pls.' Opp'n
Ex. A, ECF No. 38-2.  On January 2, 2022, upon clicking on the link provided in the email, Gordon
was taken to the log-in page for the WFT/Ticketmaster Website.  Though no terms and conditions
from the Washington Football Team, PFI, WFI, or CSC appeared on the Ticketmaster log-in page,
it contained a notice stating that "By continuing past this page, you agree to the Terms of Use and
understand that information will be used as described in both the Ticketmaster Privacy Policy and
Washington [Football Team] Privacy Policy."  Carabajal Decl. Ex. 1, Defs.' Reply Ex. A, ECF
No. 40-1.  The phrases "Terms of Use," "Privacy Policy," and "Washington [Football Team]
Privacy Policy" appear in a differently-colored font than the surrounding text, which represents to
the user that the text is a clickable link.  *Id.*  Upon clicking on the "Terms of Use" link, a box
appears which allows the user to toggle between the Ticketmaster Terms of Use and the WFT
Terms & Conditions.  The parties disagree on which set of terms appears initially to the user.

Though Gordon accurately states that no Terms of Use appeared on the log-in page, a pop-
up window appeared subsequent to sign-in which contained the same tabs for the Ticketmaster
Terms of Use and the WFT Terms & Conditions, with the parties in disagreement as to which set
of terms actually appeared to the user.

When the tab for WFT Terms & Conditions is selected, the following relevant language
appears:

> Tickets to Washington [Football Team] games and other events held at FedEx Field
> are revocable licenses that only grant a one-time entry into the stadium . . . for the
> specified game or event (the "Event") with no right of re-entry.  The person seeking
> entry pursuant to such license, and any accompanying minors or guests ("Holder"),
> agrees that such license is subject to these terms ("Terms") and by purchase,
> acceptance, and/or use of such license, Holder is deemed to have read the Terms
> and has agreed to be bound by them.  Failure to comply with the Terms shall result
> in forfeiture of the license and all rights arising under it without refund and entitle
> the Team, the National Football League ("NFL"), and/or, if applicable, WFI
> Stadium Inc. (individually or collectively, "Management") to pursue all legal

remedies available.  Admission may be refused or revoked and Holder may be ejected in Management's sole discretion. . . .  ANY DISPUTE, CLAIM, OR CAUSE OF ACTION IN ANY WAY RELATED TO THE TICKET OR THE EVENT SHALL BE RESOLVED BY MANDATORY, CONFIDENTIAL, FINAL, AND BINDING ARBITRATION IN LANDOVER, MARYLAND. HOLDER AND MANAGEMENT AGREE THAT ALL DISPUTES SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS.  HOLDER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT HOLDER IS WAIVING HOLDER's . . .

Carabajal Decl. Ex. 1.  Additional language from the arbitration clause is apparently available for review but would require the user to scroll down.  The pop-up window, regardless of whether the Ticketmaster Terms of Use or the WFT Terms & Conditions appeared on screen, had a button labeled "Agree" for a user to click in order to continue to the ticket download.  Carabajal Decl. ¶ 8, Ex. 1.  Only after signing into the WFT/Ticketmaster Website and clicking "Agree" at the pop-up window would a user be able to download purchased tickets.  Carabajal Decl. ¶ 8.  According to WFT electronic records, Gordon clicked on the "Agree" button at 1:41 a.m. on January 2, 2022.

Gordon has submitted images of the tickets which he downloaded into his Apple Wallet application.  The tickets appeared as a burgundy rectangle on a black background with "Washington Football Team" appearing in gold text at the top of the ticket.  Gordon Decl. Ex. 4, Opp'n Ex. A, ECF No. 38-2.  The seat assignment information and stadium entry information appeared in white text, along with a QR code which was to be scanned by ticket-takers at entry. At the top of the ticket, in a blue graphic on the ticket's black background, appeared an image of a small circle with three dots.  A person clicking on that graphic would be taken to a secondary ticket page, referred to by Defendants as the "back" of the ticket, which displayed the WFT Terms & Conditions, including the arbitration clause, of which only the first sentence is visible without scrolling down.

On the day of the game, Gordon and Plaintiffs approached an entry gate at the stadium, and Gordon opened the electronic tickets on his cell phone. Ticket-takers scanned each of the nine tickets from Gordon's cell phone. All four Plaintiffs, as well as other members of their party, were allowed to pass into the stadium after the tickets were scanned off of Gordon's cell phone. The ticket-takers did not provide copies of the WFT Terms & Conditions to Plaintiffs, and there were no signs displaying or referring to the WFT Terms & Conditions at the entry gate. Plaintiffs never possessed the tickets on their own cell phones or otherwise, and they never personally manifested assent to the WFT Terms & Conditions.

## DISCUSSION

In their Motion to Compel Arbitration and Dismiss, Defendants assert that this dispute is subject to arbitration because the WFT Terms & Conditions include a binding arbitration clause which covers "any dispute, claim, or cause of action in any way related to the ticket or the event." Defs.' Mot. at 7, ECF No. 35-1. Plaintiffs do not dispute that the language of the arbitration clause would encompass the present dispute. Rather, in their Cross Motion for Partial Summary Judgment, Plaintiffs request that the Court find, as a matter of law, that there was no agreement to arbitrate between Plaintiffs and Defendants because neither Gordon nor Plaintiffs ever agreed to the WFT Terms & Conditions or otherwise entered into contract containing those terms. The record includes declarations from Gordon and Naimoli; screen-capture images from Gordon's cell phone and from the WFT/Ticketmaster Website accessed by Plaintiffs for purposes of this case after the date of the game; a declaration from Taylor Laurer, Vice President of Live Events, Ticket Services Operations, for Pro-Football, Inc., who attested to the available ticketing methods for attendees of the game in question and provided the language of the WFT Terms & Conditions; and a declaration with exhibits submitted by Matthew Carabajal, Senior Director of Ticket Operations

for the Washington Commanders, who reviewed relevant electronic records and provided screen-capture images of webpages and electronic tickets as they would have appeared to Gordon.

## I.     Legal Standards

### A.     Motion to Compel Arbitration

Judges in this District have recognized that "motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 589 (D. Md. 2013) (quoting *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004)); *PC Constr. Co. v. City of Salisbury*, 871 F. Supp. 2d 475, 477 (D. Md. 2012).   Treating a motion to compel arbitration as a motion for summary judgment is proper where "the formation or validity of the arbitration agreement is in dispute," *Caire*, 982 F. Supp. 2d at 589, or where documents outside the pleadings must be considered "to effectively assess the merits of [the] motion," *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683-84 (D. Md. 2004); *accord PC Constr. Co.*, 871 F. Supp. 2d at 477 ("Whether the motion [to compel arbitration] should be treated as a motion to dismiss or a motion for summary judgment turns on whether the court must consider documents outside the pleadings."). *See also Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 & n.3 (4th Cir. 2016) (stating that under the Federal Arbitration Act, a party seeking a jury trial "must show genuine issues of material fact regarding the existence of an agreement to arbitrate," a standard that is "akin to the burden on summary judgment" (quoting *Chorley Enters. v. Dickey's Barbecue Rests.*, 807 F.3d 553, 564 (4th Cir. 2015))).   Here, the Court will apply the summary judgment standard both because it must address whether an arbitration agreement was formed and because addressing this question requires consideration of materials beyond the pleadings.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B.     The Federal Arbitration Act

The Motion to Compel Arbitration is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-6 (2018), which provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Id.* § 2. A litigant in federal court may compel arbitration under the FAA upon a demonstration of: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision that purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate the dispute. *Whiteside v. Teltech Corp.*, 940 F.2d

9

99, 102 (4th Cir. 1991). Here, there is no present dispute relating to the first, third, and fourth elements, and there is no dispute that the language of the arbitration clause covers the present dispute. Thus, as discussed above, the only issue in dispute is whether the arbitration clause was part of an agreement between the parties.

The FAA establishes a "federal policy favoring arbitration." *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005). At the same time, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The issue of whether an agreement to arbitrate exists is an issue of contract law, and courts "apply the ordinary state-law principles that govern the formation of contracts" in reviewing a challenge to a party's failure to arbitrate. *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019).

Defendants assert, and Plaintiffs do not dispute, that Maryland law applies to this case. In Maryland, the formation of a contract requires an offer by one party, acceptance by another, and consideration. *Cochran v. Norkunas*, 919 A.2d 700, 713 (Md. 2007). "Common to all manifestation of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation." *Id.*

## II.    Contract Formation

Defendants first argue that a valid contract with an arbitration clause was established when Gordon accepted the WFT Terms & Conditions because he accepted and agreed to those terms through his conduct in accessing the WTF/Ticketmaster Website and downloading the tickets. Specifically, they contend that three acts independently demonstrate such an agreement: (1) moving past the log-in screen which contained a statement that doing so would constitute acceptance of the "Terms of Use"; (2) clicking "Agree" when a copy of the WFT Terms &

Conditions appeared in a pop-up window; and (3) downloading and using the electronic ticket itself, which contained the WFT Terms & Conditions on its electronic "back." Plaintiffs state that no contract was formed because Gordon did not actually accept the WFT Terms & Conditions, and in any event the presentation of the WFT Terms & Conditions in these ways did not provide adequate notice to Gordon of their existence or contents.

When faced with purported contracts formed during online commercial activities based on acceptance of a company's terms and conditions, courts consider whether there is evidence of actual or constructive knowledge of the terms and manifested assent to them. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019); *Optimum Constr., Inc. v. Harbor Bus. Compliance Corp.*, No. MJM-21-2432, 2022 WL 4608170. at *5 (D. Md. Sept. 30, 2022) (collecting cases); *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669–70 (D. Md. 2009). Constructive knowledge depends on the "conspicuousness and placement of the terms and conditions, as well as the content and overall design" of the website, and courts generally will not enforce agreements when the terms are "buried at the bottom of the page or tucked away in obscure corners of the website, especially when such scrolling is not required to use the site," or when "the terms are available only if users scroll to a different screen," "complete a multiple-step process of clicking non-obvious links," or "parse through confusing or distracting content and advertisements." *Wilson*, 944 F.3d. at 1221 (internal citations omitted). "[E]ven where the terms are accessible via a conspicuous hyperlink in close proximity to a button necessary to the function of the website, courts have declined to enforce such agreements." *Id.* In general, a "clickwrap" agreement, in which a website user is required to click on an "I agree" box after being presented with the terms and conditions of use, is likely to be deemed sufficient to form a contract, while a "browsewrap" agreement, under which the terms and conditions are generally posted on the website via a

11

hyperlink, including with a notice that use of the website constitutes agreement to be bound by the terms and conditions, may not be sufficient. *See Nguyen v. Barnes & Noble, Inc.*, 763 F. 3d 1171, 1174–76, 1179 (9th Cir. 2014) (holding that a browsewrap agreement in which the terms and conditions were available via a conspicuous hyperlink on every page and in close proximity to a button that had to be clicked on, but otherwise provided no notice to users, was insufficient without more to establish constructive knowledge). Ultimately, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.*

Here, Defendants have asserted that the WFT/Ticketmaster Website had both a browsewrap agreement, consisting of a hyperlink on the log-in page leading to the "Terms of Use" and a notice that continuing past that page would constitute agreement to the Terms of Use, and a clickwrap agreement, consisting of a pop-up window with the WFT Terms & Conditions requiring the user to click "Agree." Courts applying Maryland law have accepted that clickwrap agreements can constitute valid contracts. *See, e.g.*, *CoStar Realty Info., Inc.*, 612 F. Supp. 2d at 668-69; *Fusha v. Delta Airlines, Inc.*, No. RDB-10-2571, 2011 WL 3849657, at \*2-4 (D. Md. Aug. 30, 2011). For example, in *CoStar Realty*, the court held that a party had consented to a forum selection clause based on evidence that users of a certain database were presented with a pop-up window containing CoStar Realty's Terms of Use, through which users were required to scroll and affirmatively accept the first time they used CoStar Realty's database. *CoStar Realty Info., Inc.*, 612 F. Supp. 2d at 665, 668-70. Thus, if Defendants are correct that after signing into the WFT/Ticketmaster Website, Gordon was presented with a pop-up window with the WFT Terms & Conditions and clicked that he agreed to them, he would have entered into a valid contract, including the arbitration clause. While Gordon, in his declaration, denied that the WFT Terms & Conditions appeared on the log-in page, and more broadly denied entering into any contract, he did not specifically deny

seeing a pop-up window after signing in or clicking "agree" at that time. Moreover, Defendants have presented an electronic record which, according to Carabajal, shows that Gordon clicked on such a button.

However, there remains a factual dispute that precludes a finding of a valid contract on this basis at this time. Plaintiffs have asserted in their reply brief, and have provided corroborating screen-capture images, that upon signing into the WFT/Ticketmaster Website, the pop-up window with the clickwrap agreement initially displays the Ticketmaster Terms of Use, not the WFT Terms & Conditions. Pls.' Reply Ex. 3, ECF No. 41-3. Although the WFT Terms & Conditions can be accessed from that screen by clicking on a separate button, they assert that if a user clicks "Agree" as to the Ticketmaster Terms of Use, the pop-up window disappears, and the user can proceed without ever viewing the WFT Terms & Conditions. Pls.' Reply at 5-6. Though Defendants, through the declaration of Carabajal, appear to claim that it is the WFT Terms & Conditions that first appear on this screen, they have not provided evidence that clearly refutes Plaintiffs' claim, and their exhibits corroborate Plaintiffs' assertion that the pop-up window shows two tabs, one for the Ticketmaster Terms of Use and one for the WFT Terms & Conditions. Significantly, the window contains no statement that users must view and agree to both sets of terms. Under these circumstances, this factual dispute is material because if Gordon moved past the pop-up window by viewing and agreeing only to the Ticketmaster Terms of Use, which do not include the arbitration agreement, he would not have agreed to the WFT Terms & Conditions.

This same issue impacts the question of whether the browsewrap agreement at the log-in page could establish an agreement to the WFT Terms & Conditions, because Plaintiffs have asserted, and provided a screen-capture image showing, that clicking on the hyperlink on the log-in page for "Terms of Use" takes the user initially to a window with the Ticketmaster Terms of

Use displayed, along with a tab for the WFT Terms & Conditions, but with no language warning the user that the WFT Terms & Conditions are part of the "Terms of Use" referenced on the log-in page and must also be reviewed.  Pls.' Reply Ex. 2, ECF No. 41-3.

Where Carabajal was not employed by PFI at the time of the incident in question and has presented facts based on an after-the-fact effort to re-create the conditions in place at that time, it is not certain that his information is more reliable than that presented by Plaintiffs after a similar effort.  Moreover, Carbajal's submission raises additional questions, such as why there is a difference in the language of the WFT Terms & Conditions, specifically as to the designated location for any arbitration session, between the version appearing on the image purporting to show the contents of the pop-up window and the versions submitted by Laurier and appearing on the purported "back" of the electronic ticket. *Compare* Carabajal Decl. Ex. 1 *with* Carabajal Decl. Ex. 5, Reply Ex. A, ECF No. 40-1, *and* Laurer Decl. Ex. 1 at 1.  Under these circumstances, the Court cannot make a determination of whether Gordon agreed to the WFT Terms & Conditions and the arbitration clause based on the present record and without some discovery on this issue.

As for the third means by which Defendants argue that a contract was formed, the presence of the WFT Terms & Conditions on the "back" of the electronic ticket, the Court finds that basis entirely insufficient to establish an agreement to a contract.  As discussed above, when Gordon downloaded the electronic tickets, for each ticket all he received was an image of a ticket, which included a QR code to be scanned, but with no language referencing the WFT Terms & Conditions or the existence of a "back" of the electronic ticket.  The only way that a user could learn that the WFT Terms & Conditions were meant to be part of the ticket would be to click on a small circle with three dots in the upper right corner of the ticket, which contained no language directing the user to click on it, stating that it would lead to the "back" of the ticket, or informing the user that

14

it would lead to the WFT Terms & Conditions which are part of a contract to which the user was agreeing. The Court rejects Defendants' claim that this unmarked, tiny graphic provided sufficient notice to establish constructive knowledge of the WFT Terms & Conditions and instead finds that this design constituted a "hide-the-ball exercise" that courts have found insufficient to establish a contract. *See Wilson*, 944 F.3d at 1221 (holding that where the "Terms & Policy" containing an arbitration clause were accessed by clicking on "three white dots representing the settings menu, tucked away in the corner" of a screen, the plaintiff user was not bound by those terms because "there is no reason to assume the users will click on the settings menu simply because it exists" and "[o]nly curiosity or dumb luck might bring a user to discover the Terms").

Because there is a genuine issue of material fact on the remaining means by which Defendants can establish that Gordon entered into a contract including the arbitration clause, the Court cannot make a finding on this issue at this time. The Court, however, need not order discovery on this issue because, as discussed below, the Motion will be denied because regardless of whether Gordon entered into a contract including the arbitration clause, Defendants have not demonstrated that Plaintiffs were bound by the terms of that contract.

## III.   Agency

Even if Gordon is fairly deemed to have entered into a contract with an arbitration clause with PFI and WFI, Plaintiffs argue that they are not bound by the arbitration clause because they did not personally purchase the tickets, visit the WFT/Ticketmaster Website, or even have the electronic tickets on their cell phones. Defendants do not dispute these facts but instead argue that Plaintiffs are bound by the arbitration clause because Gordon was acting as their agent for purposes of the purchase and use of the tickets. Plaintiffs dispute Defendants' characterization of Gordon

15

as their agent and argue that even if he was acting on their behalf to obtain the tickets, he did not act with actual or apparent authority to bind Plaintiffs to the arbitration clause.

An agency relationship involves one person, the principal, who is legally bound by actions taken by another person, the agent. *Dickerson v. Longoria*, 995 A.2d 721, 735 (Md. 2010). "[W]hen a party asserts a claim that is dependent upon an agency relationship created by inference, that party has the burden of proving the existence of the principal-agent relationship, including its nature and its extent." *Jackson v. 2109 Brandywine, LLC*, 952 A.2d 304, 322 (Md. Ct. Spec. App. 2008) (citing *Hofherr v. Dart Indus., Inc.*, 853 F.2d 259, 262 (4th Cir. 1988) ("The burden of proving the existence of an agency relationship is upon the party who seeks to rely upon it.")).

Under Maryland law, a principal-agent relationship may be based on actual or apparent authority. *Dickerson*, 995 A.2d at 735. An agency relationship can be created when the principal "confers actual authority on the agent," either by "written or spoken words or other conduct of the principal," including acquiescence, "which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* (quoting *Citizens v. Maryland Indus.*, 659 A.2d 313, 318 (Md. 1995)). An agency relationship is based on apparent authority, such that a principal is bound by the acts of a purported agent, when "certain acts or manifestations by the alleged principal to a third party lead[s] the third party to believe that an agent had authority to act." *Id.* (quoting *Klein v. Weiss*, 395 A.2d 126, 140 (Md. 1978)). The conduct can include "written or spoken words or any other conduct of the principal" and binds the principal if "reasonably interpreted," it "causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Parker v. Junior Press Printing Serv., Inc.*, 296 A.2d 377, 380 (Md. 1972). Under Maryland law, the doctrine of apparent agency has three elements: (1) the apparent principal created or acquiesced in the appearance that an

16

agency relationship existed; (2) the third party believed that an agency relationship existed and relied on that belief in transacting with the apparent agent; and (3) the third party's belief and reliance were reasonable. *Bradford v. Jai Med. Sys. Managed Care Orgs., Inc.*, 93 A.3d 697, 707 (Md. 2014). Under either type of authority, an agent "cannot . . . enlarge the actual authority by his [or her] own acts without some measure of assent or acquiescence on the part of [the] principal." *Dickerson*, 995 A.2d at 735 (quoting *P. Flanigan & Sons v. Childs*, 248 A.2d 473, 477 (Md. 1968)).

In applying these principles, Maryland courts have required more than the establishment or appearance of a general principal-agent relationship and instead have drawn distinctions based on the types of decisions that the principal appeared to authorize the agent to undertake, and they have specifically distinguished the decision whether to enter into an arbitration agreement as part of a broader contractual relationship as requiring at least knowledge of its existence. In *Dickerson*, Carman Dickerson signed a contract to have Carter Bradley admitted to a nursing home and also signed a separate arbitration agreement that would apply to any disputes arising out of the care at the nursing home. 995 A.2d at 725–28. Although Dickerson specifically but inaccurately represented that she was the "legal representative," "legal guardian," and had "durable power of attorney for health care/resident advocacy" for Bradley, the Court of Appeals of Maryland held that she did not have actual or apparent authority to enter into the arbitration agreement. *Id.* at 726–27. The court found that while she could be deemed to have actual authority to make decisions about his health care based on a prior history of signing documents for him relating to medical care and payments, the arbitration agreement was separate from the nursing home admission contract and was not required to be signed as a condition of entry into the nursing home, and there was no evidence that Bradley had given Dickerson the authority to waive his "right of

access to the courts and right to a jury by signing an arbitration agreement on his behalf." *Id.* at 736–39. The court also rejected the claim that Dickerson had apparent authority to sign the arbitration agreement because "[n]othing in the record suggests that Bradley ever represented to [the nursing home] that Dickerson had the authority to waive his right of access to the courts and right to a trial by jury by signing an arbitration agreement on his behalf," and there was no evidence that Bradley was "ever aware of the arbitration agreement that Dickerson signed." *Id.* at 740.

Following *Dickerson*, in the similar case of *Rankin v. Brinton Woods, LLC*, 211 A.3d 645 (Md. Ct. Spec. App. 2019), in which the estate of Willie Charles, Jr. filed suit against a nursing care facility alleging negligence, survival, and wrongful death claims, the court likewise found that Charles's daughter, Marcia Rankin, did not have actual or apparent authority to bind her father to an arbitration clause contained within the nursing home admission contract that she signed in order for him to enter the facility. *Id.* at 647–48. Rankin affirmatively claimed to have the authority to sign, specifically signed the contract using the title "agent," and provided an advance healthcare directive document stating that her father had granted her authority to act on his behalf in the event he were deemed incompetent which, while not yet effective because Charles remained competent, provided an additional basis to support a belief that he had authorized Rankin to sign the contract. *Id.* at 649–50, 652. As in *Dickerson*, the court rejected the claim of actual authority because there was no express authorization given to Rankin to sign the contract, "let alone one that also impacted his right to a trial," and there was no history of "past assent to the execution of an admission contract that contained an arbitration clause." *Id.* at 651–52. Although the nursing home argued that it had apparent authority based Rankin's representations that she was her father's agent, the advance healthcare directive that was not yet in effect, and the fact that Charles manifested his assent by moving into the facility, the court rejected the claim of apparent authority and further

18

stated that there needed to be some action by Charles to "affirm" the daughter's authority or to "ratify" the contract and its provisions. *Id.* at 654. Significantly, the court further found that Charles's act of moving into the facility shortly after the signing of the nursing home admission contract did "not mean he has ratified the terms of the contract, unless he was made aware of the arbitration clause and still took no action." *Id.* The Court therefore held that "absent actual or apparent agency with the authority to execute an admission contract that included a waiver of jury trial rights, there is no valid or enforceable arbitration agreement." *Id.* at 655.

These cases establish that under Maryland law, when seeking to bind a non-signatory to an arbitration clause or agreement, actual authority requires either a specific grant of authority to enter into the agreement in question, or at least a past history of acquiescing to the same agent entering into similar agreements on the principal's behalf. *See Dickerson*, 995 A.2d at 736; *Rankin*, 211 A.3d at 651. Under *Rankin*, in which the arbitration clause was contained within the broader nursing home admission contract, there would need to be a history of assent to execution of similar contracts containing arbitration clauses. *Rankin*, 211 A.3d a 651. Here, there is no evidence that Plaintiffs conferred on Gordon actual authority to enter into a contract, much less one that included an arbitration clause. Indeed, Gordon has never claimed that he believed that Plaintiffs had directed him to enter into any contract, with or without an arbitration clause. There is also no evidence of any past history of Gordon regularly acting as an agent for purposes of ticket purchases for Plaintiffs, particularly ones including contracts with arbitration clauses. Indeed, it is not even clear that Plaintiffs were the intended users of the tickets at the time of the purchase. The Court therefore finds that Gordon had no actual authority to bind Plaintiffs to the arbitration clause.

19

As for apparent authority, consistent with the general requirement of some "written or spoken words or any other conduct of the principal" to cause a reasonable belief of agency, *Parker*, 296 A.2d at 380, *Dickerson* and *Rankin* establish that even when a purported agent explicitly claims to be acting on behalf of the principal, apparent authority is not established absent some conduct by the purported principal demonstrating to the third party that the purported agent "had the authority to waive his right of access to the courts and right to a trial by jury by signing an arbitration agreement on his behalf." *Dickerson*, 995 A.2d at 740 ("Nothing in the records suggests that Bradley ever represented to Respondent that Dickerson had the authority to waive his right of access to the courts . . . by signing an arbitration agreement on his behalf."). Even when the arbitration clause is contained within the broader contract, there needs to be some step taken to affirm the purported agent's authority. *See Rankin*, 211 A.3d at 654.

Here, to the extent that Gordon entered into a contract, he did so through a computer, while logged into the WFT/Ticketmaster Website, outside the presence of the purported principals. While any agreement by Gordon to the WFT Terms & Conditions which purported to bind "Holders" of the tickets arguably could have been viewed as expressing authority to act on their behalf, it was far less clear a claim of authority than Rankin's explicit, written assertion that she was acting as the "agent" of Charles in signing the contract containing an arbitration clause. *Rankin*, 211 A.3d at 649. Furthermore, as in *Rankin*, Plaintiffs took no actions at the time of the entry of the contract that could be construed as communicating that they had given Gordon the authority to enter into the contract. The only act they undertook was to later enter the stadium using Gordon's tickets, but in *Rankin*, the court specifically rejected the argument that Charles's act of entering the nursing home based on the contract signed by Rankin established apparent authority or ratification of the terms of the contract "unless he was made aware of the arbitration

clause and still took no action," a conclusion that is consistent with the broader principle that "an agent cannot extend his or her authority beyond the authority granted to him or her by the principal." *Id.* at 651, 654–55. Here, there is no claim or evidence that Plaintiffs were aware of the arbitration clause, or even the WFT Terms & Conditions more generally, so the Court cannot find that Gordon had apparent authority to enter into a contract containing an arbitration clause, or that Plaintiffs later ratified or assented to the contract and its arbitration clause. *See id.*

Defendants have not actually articulated their specific agency theory or sought to apply the requirements for actual authority or apparent authority under Maryland law to the present facts. While they argue that *Dickerson* and *Rankin* are distinguishable because they relate to health care decisions that can be governed by specific state laws on health care decisions, the above analysis in both cases was explicitly based on general agency law principles applicable in Maryland. *Dickerson*, 995 A.2d at 735-41; *Rankin*, 211 A.3d at 649, 653-55.

In asserting agency, Defendants rely almost entirely on multiple cases involving claims arising on cruise ships in which courts have held that plaintiffs were bound to forum selection clauses or shorter limitations periods for filing suit that were inserted into cruise ticket contracts even when the tickets were purchased or held by other individuals or entities, whom the courts deemed to be agents of the plaintiffs. *See, e.g.*, *Marek v. Marpan Two, Inc.*, 817 F.2d 242, 247 (3d Cir. 1987); *Angel v. Royal Caribbean Cruises, Ltd.*, No. 02-20409-CIV, 2002 WL 31553524, at *4 (S.D. Fla. Oct. 22, 2002). It is far from clear that the expectations for receiving and reviewing specific contract terms associated with cruise ship tickets, which are for a multi-day journey on an ocean-going vessel into international waters with overnight lodging, are necessarily applicable to tickets to attend a three-hour sporting event. More importantly, none of these cases, most of which are district court cases and many of which are unpublished, arise within the Fourth Circuit or this

District, and none apply Maryland law. None even engage in any specific analysis of the elements of agency, much less the specific agency rules applicable in Maryland, and none involve arbitration clauses. Upon consideration of the Maryland law principles discussed above, including those articulated in *Rankin* and applied to claims of agency relating to an arbitration clause contained in a larger contract, the holdings in these cruise ship cases do not appear to be compatible with Maryland law. Under these circumstances, the Court does not find that these cases provide a basis to alter the Court's conclusion based on Maryland agency law principles.

Even if the Court were to view the cruise ship cases as articulating a special exception from Maryland law on agency for cases involving the use of tickets to enter any facility, the Court still would not find that Plaintiffs were bound by the WFT Terms & Conditions. These cases articulate a standard, applicable to cases involving forum selection clauses or reduced limitations periods in cruise ticket contracts, under which even if a family member or friend who purchased or held the plaintiff's ticket is deemed to be the plaintiff's agent, there still needs to be facts supporting the conclusion that the terms of the contract could be deemed to have been reasonably communicated to the plaintiff. *See, e.g., Marek*, 817 F.2d at 245; *Santos v. Costa Cruise Lines, Inc.*, 91 F. Supp. 3d 372, 377 (E.D.N.Y. 2015). In some instances, this requirement is satisfied by the fact that the tickets were provided to the agent, and therefore fairly available to the plaintiff for review, a substantial number of days before the cruise. *See Foster v. Cunard White Star, Ltd.*, 121 F.2d 12, 13 (2d Cir. 1941) (finding the plaintiff subject to the terms of the cruise ticket contract when it was purchased by her brother, a fellow passenger, and received 17 days before the voyage); *Santos*, 91 F. Supp. 3d at 378 (finding the plaintiff bound by a forum selection clause where the ticket was received by the plaintiff's travel agent and the plaintiff had "an entire one-month period from when their travel agent received the ticket to when they boarded the ship to become meaningfully aware

of the contract terms at stake"); *DeCarlo v. Italian Line*, 416 F. Supp. 1136, 1137 (S.D.N.Y. 1976) (finding the plaintiff subject to the terms of the ticket contract when it was purchased by her friend, a fellow passenger, more than 30 days before the voyage). Here, however, the evidence provided by Defendants shows that Gordon entered the WFT/Ticketmaster Website at 1:41 a.m. on January 2, 2022, approximately 12 hours before the game started, a significantly shorter period of time during which the ticket contract would be available prior to the event than was present in *Foster*, *Santos*, and *DeCarlo.*

In other instances, the requirement of reasonable communication was satisfied because the actual cruise ticket contract was either in the possession of the plaintiff for even a brief time, or was in the possession of the agent at a time when the plaintiff was accompanying the agent, such that the plaintiff could have read it. *See Marek*, 817 F.2d at 247 (finding that the plaintiff had the opportunity to review the ticket contract where it was in a ticket folder shared with a friend and the plaintiff glanced at it after boarding the ship); *Ciliberto v. Carnival Cruise Lines, Inc.*, No. 85-4017, 1986 WL 2560, at *3 (E.D. Pa. Feb. 25, 1986) (finding that the plaintiff was on notice of the terms of the cruise ticket contract where the ticket with the relevant terms was held by a traveling companion). Here, however, it is undisputed that Plaintiffs never had actual possession of the electronic ticket. Significantly, although Gordon and Plaintiffs were together prior to entering the stadium, at that point Gordon had only the electronic ticket on his cell phone—there is no evidence that he downloaded, or even could have downloaded, the WFT Terms & Conditions that were accessible on the WFT/Ticketmaster Website. Thus, the only copy of the WFT Terms & Conditions that Plaintiffs arguably could have accessed prior to the game was the version on the "back" of the electronic ticket which, as the Court has already found, was not identified in a way

that anyone could reasonably have been aware of its existence. *See supra* part II. Thus, Plaintiffs did not have the kind of opportunity to review the contract that was present in *Marek* and *Ciliberto.*

Finally, in other cases, because the issue was the applicability of a contract clause shortening the limitations period for any civil action, courts have held plaintiffs to the terms of the clause based on the reasoning that even if the plaintiff did not have an opportunity to read the contract before the cruise, upon suffering an injury the plaintiff had ample time after the cruise to review the contract and comply with the shorter limitations period, a scenario that does not apply to an arbitration clause. *See, e.g., Angel*, 2022 WL 31553524, at 4; *Calixterio v. Carnival Corp.*, No. 15-22210, 2016 WL 3973791, at *4 (S.D. Fla. Jan. 7, 2016). Thus, even upon consideration of the cruise ship cases, the Court does not find them applicable because under the present facts, the terms of the contract, particularly the arbitration clause, were not reasonably communicated or available to Plaintiffs.

For all of these reasons, the Court finds that under Maryland law, Defendants have not met their burden to establish that Gordon was Plaintiffs' agent such that they are bound by the arbitration clause. *See Jackson*, 952 A.2d at 322. Based on this finding, the Court need not and does not address the argument that the claims against CSC must be subjected to arbitration because they are intertwined with other claims that will be sent to arbitration.

## CONCLUSION

For the foregoing reasons, the Motion to Compel Arbitration and Dismiss will be DENIED. The Cross Motion for Partial Summary Judgment will be GRANTED in that the Court finds that Plaintiffs are not bound by the arbitration clause. A separate Order shall issue.

Date:   September 14, 2023

THEODORE D. CHUANG
United States District Judge

24